UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


SANDRA R. STEELE,                    CIVIL ACTION
          Appellant                  NO. CV07-2126-A

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER      JUDGE DEE D. DRELL
OF SOCIAL SECURITY,                  MAGISTRATE JUDGE JAMES D. KIRK
          Appellee



REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


     Sandra R. Steele ("Steele") filed an application for a period
of disability and/or all insurance benefits to which she may be
entitled[1] on March 8, 2006, alleging a disability onset date of May
1, 2001 (Tr. p. 52).  That application was denied by the Social
Security Administration ("SSA") (Tr. p. 44).

     A de novo hearing was held before an Administrative Law Judge
("ALJ") on March 21, 2007, at which Steele appeared with her
attorney and a vocational expert ("VE") (Tr. p. 174).  The ALJ
found that, although Steele has severe impairments of degenerative
changes of the lumbar spine, bipolar disorder, and panic disorder

_____

     [1] The ALJ erroneously wrote in his decision that Steele
applied for a period of disability, Medicare insurance and, in a
separate application, SSI (Tr. p. 14).  There is not a separate
application for SSI in the administrative record before this
court.  Also, Steele's original application for benefits is not
limited to only a period of disability and Medicare.

(Tr. p. 16), she has the residual functional capacity to perform light work except as limited by her ability to understand, remember, and carry out more than one-step and two-step instructions (not detailed or complex work), and her inability to have more than limited interaction with the public (Tr. p. 17). The ALJ found that Steele can perform work which exists in significant numbers in the national economy such as laundry worker (44,000 jobs nationally), housekeeper/cleaner (266,000 jobs nationally), and hand-packer (104,000 jobs nationally) (Tr. p. 20) and, therefore, Steele was not under a disability as defined in the Social Security Act at any time through the date of his decision on May 23, 2007 (Tr. p. 21).

Steele requested a review of the ALJ's decision, but the Appeals Council declined to review it, and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Steele next filed this appeal for judicial review of the Commissioner's final decision. Steele raises the following issues on appeal:

> 1. The Commissioner erred by not finding that Steele suffers from an impairment or combination of impairments which meet or equal a listing under the Social Security Act.
>
> 2. The Commissioner erred by not having a medical expert present at Steele's hearing.
>
> 3. The ALJ erred in interpreting the testimony of the vocational expert.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an

application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists

in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law.  Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a

"conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

Summary of Pertinent Facts

At the time of her administrative hearing, Steele was 46 years old (Tr. p. 177), had a high school education (Tr. p. 71), and had past relevant work experience as a teacher's aide (Tr. p. 72).

1. Medical Records

In September 2005, at the LSU Health Sciences Center in Shreveport, Louisiana, Steele complained of pain and weakness in her left side (Tr. pp. 114-115). An MRI of Steele's brain was unremarkable (Tr. p. 113). X-rays of her left hip and pelvis showed osteopenia as to the bone quality and degenerative arthritis of the lumbar spine (Tr. pp. 110-112). Further x-rays of Steele's lumbar spine showed mild degenerative changes (Tr. p. 109). Steele was diagnosed with hypertension, anxiety, gastro-esophageal reflux disease, and degenerative joint disease, and she was prescribed Elavil, Naproxen, Darvocet, calcium, and vitamin D, and was referred to the pain management clinic (Tr. pp. 105-106).

Steele was treated at the Natchitoches Mental Health Clinic in 2006. In January 2006, Steele was found to be anxious and depressed, but her thoughts were unremarkable, she was alert and oriented, her insight was adequate, her judgment was unimpaired, and she did not appear to have a cognitive impairment (Tr. pp. 135-136). At Axis I, Steele had bipolar disorder, at Axis IV Steele had poverty, and at Axis V Steele had a GAF score of 40 (Tr. p.

136).[2]    Steele was diagnosed with bipolar disorder and panic

---

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").
     The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  DSM-IV-TR, pp. 25-30.  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information.  DSM-IV-TR, at 34.  Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

disorder (Tr. pp. 135-136), and was prescribed Lithium (an antimanic agent), Citalopram (an anti-depressant), Risperidone (an anti-psychotic), Trazodone (a serotonin modulator anti-depressant), and Lamotrigine (an anticonvulsant to increase the time between abnormal moods) (Tr. pp. 143-144).[3]

In February 2006, Steele was also diagnosed with panic disorder with some agoraphobia (Tr. p. 134). In August 2006, Steele reported suffering a recent panic attack (Tr. p. 131).

In November 2006, Dr. Wheat, a psychiatrist at the Natchitoches Mental Health Clinic, filled out mental capacity assessments for Steele (Tr. pp. 124-128). Dr. Wheat found that, as a result of her mental impairments, Steele has mild limitations in her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out short and simple instructions, to make simple work-related decisions, to interact appropriately with the general public, and to ask simple questions or request assistance (Tr. pp. 124-126). Dr. Wheat found that Steele has marked limitations in her ability to understand and remember detailed instructions, and to travel in unfamiliar places or to use public transportation (Tr. pp. 124-126). Dr. Wheat also found that Steele has moderate limitations in her ability to carry out detailed instructions, to

---

[3] See MEDLINEplus Health Information, Drug Information, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster (a service of the U.S. National Library of Medicine and the National Institutes of Health).

maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being unduly distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others (Tr. pp. 124-126). It was noted that Steele's limitations had lasted at least twelve continuous months or could be expected to last twelve continuous months at the assessed severity, and that her limitations had preexisted her admission to the clinic on January 18, 2006 (Tr. p. 126). Finally, it was stated that Steele meets the Office of Mental Health's criteria for severe mental illness, and that clinical assessment shows her psychiatric disability has existed more than a year (Tr. p. 126).

Dr. Wheat also found that, as a result of Steele's pain and other subjective symptoms from her medically determinable impairments, Steele has a moderate limitation in her ability to maintain attention and concentration for extended periods, and a

moderately severe limitation in her ability to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from medically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. pp. 127-128). It was again noted that Steele's limitations had lasted at least twelve continuous months or could be expected to last twelve continuous months at the assessed severity, and that her limitations had preexisted her admission to the clinic on January 18, 2006 (Tr. p. 128).

### 2. Administrative Hearing

At her administrative hearing in March 2007, Steele testified that she was 46 years old, right-handed, 5'1" tall, weighed about 123 pounds, and she and two of her sons had been living with her mother for about one year (Tr. pp. 177-178). Steele testified that she has a third son who is an adult (Tr. p. 179). Steele testified that she completed high school, and can read, write, and do basic math (Tr. p. 180).

Steele testified that she does not have any income and she seldom drives (Tr. pp. 179-180, 184). Steele testified that she used to work as a teacher's assistant, in different grade levels (Tr. pp. 181-182). Steele testified that she does not smoke or drink (Tr. p. 183). Steele testified that she cannot help her son in high school with his school work (Tr. p. 184). Steele testified that her medications make her sleepy all the time; she does not grocery shop or cook very much, but she does laundry (Tr. p. 184).

Steele testified that she cooks simple things and uses the microwave, but the last time she tried to cook, a fire started on the stove because she became distracted and she forgot she was cooking (Tr. p. 194). Steele also takes care of her personal hygiene (Tr. p. 190). Steele testified that she walks around the yard some during the day, she likes to take care of her mother's plants, and she watches television all day (Tr. pp. 185-186). Steele's mother is retired but she has continued to work (Tr. p. 185). Steele testified that a friend drives her to the store sometimes (Tr. p. 187). Steele testified that she used to go to church but stopped because they told her all she had to do was pray and stop taking her medications and she would be all right, but she feels like she would "rather not be alive" when she stops taking her medications (Tr. pp. 189-190).

Steele testified that she cannot work because she has problems with focusing, and she cannot be around too many people (Tr. p. 182). Steele testified that people keep her from focusing and she feels alone (Tr. p. 192). Steele also testified that she has panic attacks, caused by paranoia (Tr. pp. 187-188). Steele testified that her youngest son has seizures, which cause her to have panic attacks; he is also being treated at the Natchitoches Mental Health Clinic (Tr. p. 188). Steele testified that she feels good for about one week in a month, and the rest of the time she tends to have "outbursts" and she stays in her room (Tr. p. 191). Steele testified that she does not have any plans for the future other than to "be at peace" and to get out of the hole she is in (Tr. pp.

Steele testified she has been getting treatment at the Natchitoches Mental Health for almost two years, her primary doctors there are Dr. Small and Dr. Wheat (Tr. p. 182). Steele testified that she goes to the Mental Health Clinic twice a month; either a friend or her mother drives her there (Tr. pp. 186-187). Steele also testified that she occasionally takes Oxycodone for arthritis in her leg; it was prescribed by a doctor at the LSU Medical Center in Shreveport (Tr. p. 186). Steele also testified that she spent a month at LSU Medical Center in Shreveport to have a cyst removed and for treatment for an obstruction in her intestines (Tr. pp. 193-194).

Steele testified that she worked for the police department for one week, but walked off the job when her supervisor yelled at her in front of other people (Tr. p. 193).

The VE testified that Steele's past work as a teacher's aide was light, semiskilled work (Tr. p. 196). The VE further testified, in response to a hypothetical from the ALJ involving a person of Steele's age, education, and work experience, who can perform light work with simple one and two step instruction, but cannot do complex or detailed work, and can only have limited interaction with the public, that such a person can work as a laundry worker (44,000 jobs nationally and 4000 jobs in Louisiana), a cleaner/housekeeper in office-type settings (266,000 jobs nationally and 4500 jobs in Louisiana), or a hand-packager (104,000 jobs nationally and 800 jobs in Louisiana).

11

In response to a second hypothetical question, the VE testified that, if the person had problems which effectively precluded her from working three weeks out of a month, there were no jobs such a person could perform (Tr. p. 196). In answer to a third hypothetical question, the VE testified that if the person had four episodes a month, at unpredictable times, which precluded her from working four days a month, there were no jobs which such a person would be able to do (Tr. p. 197).

<u>ALJ's Findings</u>

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Steele (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations,

this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Steele has not engaged in substantial gainful activity since May 1, 2001 (Tr. p. 16), qualifies for disability insurance benefits through December 31, 2006, and has severe impairments of degenerative changes of the lumbar spine, bipolar disorder, and panic disorder, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 16). The ALJ also found that Steele is unable to perform her past relevant work as a teacher's aide (Tr. p. 19).

At Step No. 5 of the sequential process, the ALJ found that Steele has the residual functional capacity to perform the full range of light work except as limited by her inability to understand, remember, and carry out more than one or two step instructions (not detailed or complex work), and her inability to have more than limited interaction with the public (Tr. p. 17). The ALJ found that the claimant is a younger individual[4] with at

---

[4] The ALJ found that Steele was a "younger individual" between 18 and 44 years old (Tr. p. 19). However, Steel was 46 years old (1) when her disability insurance status expired on December 31, 2006, (2) at the time of her administrative hearing in March 2007, and (3) at the time of the ALJ's decision in May 2007. However, the distinction between the age groups for "younger persons" is irrelevant in this case since Steele is not limited to sedentary work. See 20 C.F.R. § 404.1563.

least a high school education and further found that transferability of work skills was immaterial (Tr. pp. 19-20). The ALJ found that Steele can perform work which exists in significant numbers in the national economy such as laundry worker (44,000 jobs nationally), housekeeper/cleaner (266,000 jobs nationally), and hand-packer (104,000 jobs nationally) (Tr. p. 20) and, therefore, Steele was not under a "disability" as defined in the Social Security Act at any time through the date of his decision on May 23, 2007 (Tr. p. 21).

<u>Law and Analysis</u>

Issue 1 – Listed Impairments

First, Steele contends the Commissioner erred in not finding she suffers from an impairment or combination of impairments which meet or equal a Listing in Appendix I.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. <u>Cieutat v. Bowen</u>, 824 F.2d 348, 351 n.1 (5th Cir. 1987). Also, <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). Also, <u>Selders v. Sullivan</u>, 914 F. 2d 614, 619(5th Cir. 1990). Where the impairment is severe, the Commissioner must determine whether the impairment is so severe that the claimant will be presumed to be disabled. This determination is made by comparing the impairment to a specific Listing of Impairments in

the SSA regulations.  See 20 C.F.R. § 404, Subpart P, Appendix 1.
If the claimant's condition is listed, or is medically equivalent
to a listed impairment, the claimant is conclusively determined
disabled.  Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5ᵗʰ Cir. 1987).
Also, Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5ᵗʰ Cir. 1990).
The ALJ is charged with carefully considering all the relevant
evidence and linking his findings to specific evidence.  A bare and
summary conclusion that a plaintiff does not meet the criteria of
any listing is beyond meaningful judicial review.  Drapeau v.
Massanari, 255 F.3d 1211, 1213 (10ᵗʰ Cir. 2001).

For a claimant to qualify for benefits by showing that his
unlisted impairment, or combination of impairments, is 'equivalent'
to a listed impairment, he must present medical findings equal in
severity to all the criteria for the one most similar listed
impairment." Sullivan v. Zebley, 493 U.S. 521, 531, 110 S.Ct. 885
(1990); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990) ; 20
C.F.R. § 404.1526; 20 C.F.R. § 416.926.  A claimant cannot qualify
for benefits under the equivalence step by showing that the overall
functional impact of his unlisted impairment or combination of
impairments is as severe as that of a listed impairment.  Sullivan,
493 U.S. at 531.

In the case at bar, the ALJ stated in his decision that he
compared Steele's mental impairments of bipolar disorder and panic
attacks to Listing 12.04, Affective Disorders, and Listing 12.06,
Anxiety-Related Disorders.  The ALJ stated that Steele's primary
complaint as to her functioning is her dislike for crowds of people

(Tr. p. 17).  The ALJ accepted the opinion of Steele's treating psychiatrist, Dr. Wheat, that Steele is markedly limited in her ability to understand and remember detailed instructions and travel in unfamiliar places or use public transportation, and has mild to moderate limitations in other areas of mental functioning including her mildly limited ability to interact appropriately with the public (Tr. p. 18).  The ALJ also accepted the evaluation of a non-examining psychologist-consultant, who reviewed Steele's medical records and stated he believed Steele can perform simple work with limited interaction with the public (Tr. p. 19).

Steele relies on Dr. Wheat's assessment that she has bipolar disorder in her argument that she meets Listing 12.04(3).  Listing 12.04(3) requires "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" and at least two areas of marked difficulty (as enumerated in Listing 12.04(3)(B)),[5] or a medically documented history of at least two years duration of a chronic affective disorder with additional requirements.[6]

_____

[5] Listing 12.04(3)(B) requires at least two of: (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.

[6] Listing 12.04(3)(C) requires a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the

16

The medical evidence does not indicate that Steele has marked difficulties in at least two of the listed areas in 12.04(3)(B), nor does the evidence of record include a medically documented history of bipolar disorder of at least two years duration.

According to the residual functional capacity assessment by the ALJ, which is in accordance with the opinion of Steele's treating psychiatrist, Steele can perform simple work which does not involve working with the public. That assessment was incorporated into the hypothetical question given to the VE and is is met by the jobs of laundry worker and cleaner/housekeeping as set forth by the VE.[7]

Steele also contends she meets listing 12.06, anxiety-related disorders, due to her agoraphobia which causes panic attacks and affects her ability to concentrate. However, 12.06 requires that, if a person claims to have panic attacks, they must be "recurrent,

---

following: (1) repeated episodes of decompensation, each of extended duration, (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, of (3) current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need to such an arrangement.

[7] The VE did not provide the DICOT occupation listing numbers for the jobs she described. Laundry Worker III was listed in the DICOT as light work, although Laundry Worker I and II were medium level work. The undersigned has no information as to that limitation effect that has, if any, on the numbers of jobs existing in the regional and national economies. It is also noted that the job of "hand packager" is listed in the Dictionary of Occupational Titles, at 920.587-018 as medium level work. Therefore, "hand packager" did not meet the limitation to light work given by the ALJ in his hypothetical.

severe panic attacks" which cause marked restrictions/difficulties in at least two of the listed areas, or a complete inability to function independently outside the area of her home. The evidence in the administrative transcript does not indicate that Steele's panic attacks are recurrent and severe, or, as discussed above, that she meets the secondary requirements of that listing. Dr. Wheat, Steele's primary treating physician, found Steele's difficulties in maintaining concentration, persistence, or pace were only moderate.

Therefore, Steele has not carried her burden of proving she meets the specific requirements of Listing 12.04(3) for bipolar syndrome or for Listing 12.06.

Steele also complains the ALJ's statement in his decision, that Steele was able to "function and provide coherent testimony with no apparent difficulty" at her administrative hearing, is untrue, pointing to the fact that she became so upset the ALJ offered to take a break (Tr. p. 189). Although a reading of the hearing transcript indicates that Steele had some difficulty testifying at her hearing, Steele has not explained how that error in that respect affects her ability to work as a laundry worker or cleaner/housekeeping.

Finally, Steele points out that she has degenerative joint disease of the lumbar spine, but has not stated how that affects her ability to work. The medical records indicate Steele has only mild degenerative changes.

Therefore, substantial evidence supports the Commissioner's

conclusion Steele does not meet a listed impairment in Appendix I and there is work which Steele can perform despite her impairments.

<u>Issue 2 - Medical Expert</u>

Next, Steele contends the Commissioner/ALJ erred by not having a medical expert present at Steele's hearing.

The ALJ has the discretion to order a consultative examination. An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision. <u>Anderson v. Bowen</u>, 887 F.2d 630, 634 (5th Cir. 1989). Also, <u>Brock v. Chater</u>, 84 F.3d 726 (5th Cir. 1996); <u>Wren v. Sullivan</u>, 925 F.2d 123, 127 (5th Cir. 1991); <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1472 (5th Cir. 1989).

Steele had ample medical records in the administrative transcript for the ALJ for make his findings and conclusions. In particular, the evaluations of Steele's mental residual functional capacity by Dr. Wheat, Steele's treating psychiatrist, were comprehensive. Since there is sufficient evidence for the ALJ to determine that Steele was not disabled, appointment of a medical consultant was not necessary to assist the ALJ.

The ALJ did not abuse his discretion in not employing a medical expert consultant.

<u>Issue 3 - Vocational Expert</u>

Finally, Steele contends the ALJ erred in interpreting the testimony of the vocational expert. Specifically, Steele claims the ALJ erred in finding her job as a teacher's aide was past

relevant work because she did that work a long time ago, and points to a more recent unsuccessful attempt to work for the police department. Steele also contends the VE testified there were no jobs which Steele can perform, given her inability to function three weeks out of four.

Past relevant work is work a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). The administrative record shows Steele worked as a teacher's aide from 1989 through 1999 (Tr. p. 72). Therefore, Steele's work as a teacher's aide was within the last 15 years and qualified as "past relevant work."

Steele also claims her one week of work with the police department constitutes an unsuccessful work attempt and shows she is unable to work. The ALJ made no findings on this issue and did not mention that job in his decision. However, the fact that Steele walked away from her job with the police department after only one week, because her supervisor yelled at her in front of other people and made her angry, does not qualify as an unsuccessful work attempt. An unsuccessful work attempt is defined as follows: "[o]rdinarily, work you have done will not show that your able to do substantial gainful activity if, after working for a period of 6 months or less, you were forced by your impairment to stop working or to reduce the amount of work you do so that you are no longer performing substantial gainful activity." 20 C.F.R. § 404.1575(d). Also, "work of 3 months or less [is] an unsuccessful

work attempt if it ended, or was reduced below substantial gainful activity, because of your impairment or because of the removal of special conditions which took into account you impairment and permitted you to work." 20 C.F.R. § 404.1575(d). Since Steele admits she quit her job because her supervisor yelled at her, and not because of her disability, that job does not appear to qualify as an "unsuccessful work attempt."

Finally, Steele contends the VE testified there were no jobs which Steele can perform if she is unable to function three weeks out of four, or if she has four intermittent "episodes" a month. Contrary to Steele's argument in her brief, that testimony was given in response to hypothetical questions posed to the VE by the ALJ, and was not based on the VE's personal opinion of Steele's abilities after observing her at the hearing. Moreover, Steele's alleged inability to function for three weeks every month is based solely on Steele's self-serving testimony; the medical evidence, including that of Steele's treating psychiatrist, does not support that contention.

Therefore, substantial evidence supports the Commissioner's finding that Steele can perform work which exists in significant numbers in the national and regional economies.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Steele's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and

Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 21st day of September, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE